130 Cal.Rptr.2d 315 (2003)
105 Cal.App.4th 1169
James SMITH, Plaintiff and Respondent,
v.
M.D., a Minor, etc., Defendant and Appellant.
M.D., a Minor, etc., Petitioner,
v.
The Superior Court of Los Angeles County, Respondent;
James Smith, Real Party in Interest.
Nos. B159868, B160628.
Court of Appeal, Second District, Division Two.
January 30, 2003.
As Modified February 11, 2003.
Review Granted April 23, 2003.
*318 Law Offices of Michael Thomas, Janet L. Keuper and Mirth White, Long Beach, for Petitioner.
No appearance by Respondent.
Stephen C. Moore for Real Party in Interest.
BOREN, P.J.
Real party in interest, James Smith, brought a defamation action against petitioner M.D., a minor. Smith alleged that M.D., at six years of age, falsely reported to her grandmother, her parents and the police that Smith had sexually molested her. When M.D.'s demurrer was overruled, this petition for writ of mandate followed. We hold that the Child Abuse and Neglect Reporting Act (Pen.Code, § 11164 et seq.)[1] (Act), including the privileges set forth therein, does not apply to minors who report claimed sexual abuse, and that such minors are therefore entitled to assert the absolute privilege contained within Civil Code section 47, subdivision (b) (Civil Code section 47(b)). Because we conclude the trial court erred in overruling M.D.'s demurrer, we will issue a peremptory writ of mandate directing respondent court to vacate its order overruling M.D.'s demurrer and to enter an order sustaining the demurrer without leave to amend.

I. FACTUAL AND PROCEDURAL BACKGROUND
We take the relevant facts from Smith's complaint, and, in accordance with the standard of review, must take these alleged facts to be true. (Moore v. Conliffe (1994) 7 Cal.4th 634, 638, 29 Cal.Rptr.2d 152, 871 P.2d 204; Phillips v. Desert Hospital Dist. (1989) 49 Cal.3d 699, 702, 263 Cal.Rptr. 119, 780 P.2d 349.) We also accept as true all facts appearing in exhibits attached to the complaint.[2] (Dodd v. Citizens Bank of Costa Mesa (1990) 222 Cal.App.3d 1624, 1627, 272 Cal.Rptr. 623.)
In November 2000, M.D., then six years of age, falsely accused Smith of "performing various sexually deviant acts" upon her person. These statements were made first to M.D.'s grandmother and then to M.D.'s parents. After her parents reported the *319 alleged molestation to the police, M.D. was interviewed by police officers. M.D. repeated the accusations to the police. At the time M.D. made each of the statements she knew them to be false. As a result of M.D's false accusations, Smith was arrested, booked and jailed. On January 10, 2001, the criminal complaint was dismissed pursuant to section 1385.[3] On January 7, 2002, Smith filed suit against M.D. for defamation.[4]
M.D. demurred to the complaint, urging that Smith had failed to state facts sufficient to constitute a cause of action against her because her statements to her caregivers and the police were absolutely privileged under Civil Code section 47(b). M.D. also asserted that public policy requires that children of tender years be immune from defamation lawsuits based on reports of child sexual abuse.
The trial court overruled M.D.'s demurrer, rejecting her public policy argument. The court also held that minors who report sexual abuse are permissive reporters under section 11166, subdivision (e)[5] of the Act. Relying on Roe v. Superior Court (1991) 229 Cal.App.3d 832, 280 Cal.Rptr. 380 (Roe ), the court found that statements made by M.D.'s caregivers to the police could be imputed to M.D. for the purposes of the Act. Citing Begier v. Strom (1996) 46 Cal.App.4th 877, 54 Cal.Rptr.2d 158 (Begier), the court held that the specific privileges set forth within section 11172, subdivision (a)[6] of the Act override all *320 other privileges, including those contained within Civil Code section 47(b). In other words, M.D., as a permissive reporter, was entitled to assert the section 11172, subdivision (a) qualified privilege, but not the absolute privilege set forth within Civil Code section 47(b). This petition for writ of mandate followed.

II. ISSUES
This petition raises several contentions. First, M.D. urges that minors reporting sexual molestation do not qualify as permissive reporters under the Act. Second, she argues that a six-year-old minor reporting claimed sexual abuse first to her caregivers and then to the police is entitled to assert the absolute privilege set forth in Civil Code section 47(b). Finally, she claims that minors of tender years should be immune from defamation lawsuits based on allegations of child sexual abuse.

III. DISCUSSION

A. Writ Relief
"[A]n order overruling a demurrer is not directly appealable but may be reviewed on an appeal from the final judgment." (San Diego Gas & Electric Co. v. Superior Court (1996) 13 Cal.4th 893, 912-913, 55 Cal.Rptr.2d 724, 920 P.2d 669.) "Appeal is presumed to be an adequate remedy and writ review is rarely granted unless a significant issue of law is raised, or resolution of the issue would result in a final disposition as to the petitioner." (Casterson v. Superior Court (2002) 101 Cal.App.4th 177, 182, 123 Cal.Rptr.2d 637.) This petition raises issues of first impression, the resolution of which in M.D.'s favor will result in a final disposition as to her.

B. Standard of Review
In considering the propriety of an order overruling a demurrer, we review the order de novo, exercising our independent judgment about whether the complaint states a cause of action as a matter of law. (Traders Sports, Inc. v. City of San Leandro (2001) 93 Cal.App.4th 37, 43, 112 Cal.Rptr.2d 677.) "We give the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context. [Citations.] We deem to be true all material facts properly pled. [Citations.] We must also accept as true those facts that may be implied or inferred from those expressly alleged. [Citation.]" (Ibid) "A general demurrer will lie where the complaint `has included allegations that clearly disclose some defense or bar to recovery.' [Citation.] Thus, a demurrer based on an affirmative defense will be *321 sustained only where the face of the complaint discloses that the action is necessarily barred by the defense. [Citation.]" (Casterson v. Superior Court, supra, 101 Cal.App.4th at p. 183, 123 Cal.Rptr.2d 637.)
The interpretation of the Act is a pure question of law which we review independently. (Rothman v. Jackson (1996) 49 Cal.App.4th 1134, 1139-1140, 57 Cal. Rptr.2d 284.)

C. The Act does not apply to minors reporting claimed sexual abuse.
The Act requires "a mandated reporter" who "has knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect" to make a report to certain designated agencies. (§ 11166, subd. (a).) "Any other person who has knowledge of or observes a child whom he or she knows or reasonably suspects has been a victim of child abuse" may make a report, but is not required to do so. (§ 11166, subd. (e).) These individuals are known as permissive reporters. (Thomas v. Chadwick (1990) 224 Cal. App.3d 813, 819-820, fn. 8, 274 Cal.Rptr. 128.) Section 11172, subdivision (a) provides "[a]ny other person" who makes a child abuse report with qualified immunity.
Smith argues that a six-year-old minor such as M.D. qualifies as "[a]ny other person" as that term is used in sections 11166, subdivision (e) and 11172, subdivision (a), and that M.D. is therefore a permissive reporter under the Act. M.D. responds that the phrase "any other person" refers to third parties who report instances of known or suspected child abuse, not to children who report their own sexual child abuse. Review of the Act, together with application of the principles of statutory interpretation, persuade us that M.D. is not a permissive reporter under the Act.
"The fundamental goal of statutory interpretation is to ascertain the Legislature's intent to effectuate the purpose of the law, focusing not only on the words used but also the objectives of the statute, the evils to be remedied and the legislative history of the statute. [Citation.]" (Thomas v. Chadwick, supra, 224 Cal. App.3d at p. 821, 274 Cal.Rptr. 128.)
The evil to be remedied, i.e., the abuse of children, is an evil that has tragic consequences for both the child victim and our society.[7] (Hale & Underwood, Child *322 Abuse: Helping Kids Who Are Hurting (1991) 74 Marq. L.Rev. 560, 561 ["Victims of child abuse and neglect exhibit devastating consequences as adults. Statistically, these individuals have lower IQs, a higher frequency of suicide attempts and more alcohol-related problems. Furthermore, they are significantly more prone to become abusers themselves"], fns. omitted.)
In 1962, the publication of The Battered Child Syndrome by Dr. C. Henry Kempe drew wide public attention to the problem of child abuse for the first time. (Singley, Failure To Report Suspected Child Abuse: Civil Liability of Mandated Reporters (1998) 19 J. Juv. L. 236, 238.)
In 1963, California, recognizing the necessity for early detection and reporting of child abuse, became the first state to adopt a mandated child abuse reporting statute when it added former section 11161.5[8] to the Penal Code.[9] The statute required physicians and surgeons to report suspected instances of child abuse to designated local agencies when it appeared to these professionals "from observation of the minor that the minor may have been a victim" of child abuse. "Physicians were targeted ... because of the assumption that they were more likely than other groups to come in contact with injured children." (Trost, Chilling Child Abuse Reporting: Rethinking The CAPTA Amendments, supra, 51 Vand. L.Rev. at p. 192, fn. 47.)
In 1974, Congress enacted the Child Abuse Prevention and Treatment Act of 1974. (Pub.L. No. 93-247 (Jan. 31, 1974) 88 Stat. 4; codified in 42 U.S.C. §§ 5101 et seq.) "Congress intended the federal act to facilitate state programs whose objective is to prevent, identify and treat victims of child abuse. [Citation.]" (Thomas v. Chadtvick, supra, 224 Cal.App.3d at p. 825, 274 Cal.Rptr. 128.) Toward that goal federal grants were authorized, conditioned on the requirement that states have laws providing "for the reporting of known or suspected instances of child abuse and neglect." (Former 45 C.F.R. § 1340.3-3(d)(2)(i).) The requirement was "deemed satisfied if a State requires specified persons by law, and has a law or administrative procedure which requires, allows, or encourages all other citizens, to report known or suspected instances of child abuse and neglect to one or more properly constituted authorities with the power and responsibility to perform an investigation and take necessary ameliorative and protective steps." (Ibid, italics added.)
*323 In 1975, our Legislature enacted former 11161.6, California's first permissive reporting statute. It allowed, but did not require, "probation officerfs]" who "observe" suspected child abuse to make a report to certain specified agencies. (Former § 11161.6.)
In 1976, former section 11161.6 was amended to provide as follows: "In any case in which a minor is observed by a probation officer or any person other than a person described in Section 11161.5 and it appears to the probation officer or person from observation of the minor that the minor has a physical injury or injuries which appear to have been inflicted upon him by other than accidental means by any person, that the minor has been sexually molested, or that any injury prohibited by the terms of section 273a has been inflicted upon the minor, he may report such injury to the agencies designated in Section 11161.5.[11] No probation officer or person shall incur any civil or criminal liability as a result of making any report authorized by this section unless it can be proven that a false report was made and the probation officer or person knew or should have known that the report was false." (Former § 11161.6.) "Legislators expected that by including lay people as reporters and providing protection for people against possible liability for making reports, the system would be more likely to uncover ongoing child abuse. Neighbors, relatives and friends might be privy to private information or observations which professionals would miss." (Marrus, Please Keep My Secret: Child Abuse Reporting Statutes, Confidentiality, and Juvenile Delinquency, supra, 11 Geo. J. Legal Ethics at p. 515, fns. omitted.)
Also in 1976, our Supreme Court held in Landeros v. Flood (1976) 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389 (Landeros) that former section 11161.5 was ambiguous with respect to the state of mind of a physician accused of failing to make a required report of child abuse. The court opined that to prove actionable failure to report, a battered child would be required to show that the physician actually "observed" the injuries and formed the opinion that they were intentionally inflicted upon the child. (Landeros v. Flood, supra, 17 Cal.3d at p. 415, 131 Cal.Rptr. 69, 551 P.2d 389.)
In November 1978, the state Department of Justice estimated that only about 10 percent of all cases of child abuse were being reported. (Stecks v. Young (1995) 38 Cal.App.4th 365, 371, 45 Cal.Rptr.2d 475.) Faced with this reality, a growing population of abused children and the need to comply more fully with federal guidelines, in 1980 the Legislature repealed former sections 11161.5 and 11161.6, and enacted the Child Abuse Reporting Law (§ 11165 et seq.), "a comprehensive scheme of reporting requirements `aimed at increasing the likelihood that child abuse victims are identified.' [Citations.]" (Stecks v. Young, supra, 38 Cal.App.4th at p. 371, 45 Cal.Rptr.2d 475.)
The 1980 version of the Act inserted the element of "knowledge" into the required and permissive reporting provisions so that specified individuals would be required to report, and others would be authorized to report, not only direct observations of child abuse, but also "knowledge" of suspected child abuse obtained directly from the child and/or from other sources. (§ 11166, subds. (a), (c);[10] 65 Ops.Cal. *324 Atty.Gen. 345 (1982).) In addition, the reporting standard was revised to require reporting whenever there exists a "reasonable suspicion" of child abuse. (Krikorian v. Barry (1987) 196 Cal.App.3d 1211, 1217, 242 Cal.Rptr. 312.) These changes were made to address the Landeros court's determination that the existing reporting statute was ambiguous.[11] (Ibid.)
Simultaneously, permissive reporters were granted qualified immunity.[12] It was believed that "`extending the limited civil and criminal immunity to "any other person making a report of child abuse or molestation" [would] encourage members of the general public to report known cases of child abuse,' and that "`[t]he limitation on the [total] immunity for false or negligent reports [was] necessary to prevent a vindictive former spouse or neighbor from making a knowingly false report.'" (Storch v. Silverman (1986) 186 Cal.App.3d 671, 680, 231 Cal.Rptr. 27, quoting State Bar of Cal., Rep. on Assem. Bill No. 2497 (1979-1980 Reg. Sess.), p. 2; See also State Bar of Cal, Com. on Juv. Justice, letter to Sen. Omer L. Rains, Feb. 20, 1980 [opining that providing complete immunity to permissive reporters was unwarranted because it would allow "third persons (e.g., a vindictive neighbor or relative) to make a malice-based report and be totally immune from civil or criminal liability"].)
Following the 1980 enactment, our Legislature continuously amended the reporting provisions as experience revealed areas in need of repair. In 1987, the Legislature once again recast the law, renaming it the Child Abuse and Neglect Reporting Act. (§ 11164, subd. (a), added by Stats.1987, ch. 1444, § 1.5, p. 5369.)
In its current form, the Act defines a "child" as "a person under the age of 18 years." (§ 11165.) "Child abuse or neglect" is defined generally as "physical injury inflicted by other than accidental means upon a child by another person." (§ 11165.6.) It also means sexual abuse, which includes sexual assault and sexual exploitation. (§ 11165.1.)
The purpose and intent of the Act "is to protect children from abuse and neglect." (§ 11164, subd. (b).) All persons participating *325 in the investigation of suspected child abuse or neglect are required to "consider the needs of the child victim," and to "do whatever is necessary to prevent psychological harm to the child victim." (Ibid.) The objective of the Act "has been to identify victims, bring them to the attention of the authorities, and, where warranted, permit intervention." (Stecks v. Young, supra, 38 Cal.App.4th at p. 371, 45 Cal.Rptr.2d 475; see also Storch v. Silverman, supra, 186 Cal.App.3d at p. 678, 231 Cal.Rptr. 27 [legislative scheme was "designed to encourage the reporting of child abuse to the greatest extent possible to prevent further abuse"].)
Thirty-four statutorily enumerated classes of individuals are identified as "mandated reporters" under section 11165.7 of the Act. These individuals are required to "make a report to an agency specified in Section 11165.9 whenever the mandated reporter, in his or her professional capacity or within the scope of his or her employment, has knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect." (§ 11166, subd. (a), italics added.) The report must be made "immediately or as soon as is practicably possible by telephone," and the reporter is required to "prepare and send a written report thereof within 36 hours of receiving the information concerning the incident." (Ibid.) Failure to comply with the reporting requirements is punishable as a misdemeanor. (§ 11166, subd. (b).)
Permissive reporters are described in section 11166, subdivision (e) of the Act as follows: "Any other person who has knowledge of or observes a child whom he or she knows or reasonably suspects has been a victim of child abuse or neglect may report the known or suspected instance of child abuse or neglect to an agency specified in Section 11165.9."[13] (§ 11166, subd. (e), italics added.)
"[I]mmunity is a key ingredient in maintaining the Act's integrity." (Stecks v. Young, supra, 38 Cal.App.4th at p. 375, 45 Cal.Rptr.2d 475.) Section 11172, subdivision (a) provides that "[n]o mandated reporter shall be civilly or criminally liable for any report required or authorized by this article." The absolute immunity conferred on mandated reporters was granted to "obviate the chilling effect the spectre of civil lawsuits would have upon a reporter's willingness to become involved." (Thomas v. Chadwick, supra, 22A Cal.App.3d at p. 821, 274 Cal.Rptr. 128; see also Storch v. Silverman, supra, 186 Cal.App.3d at p. 677, 231 Cal.Rptr. 27 [broad immunity provided by the Legislature in recognition of the burden placed upon those professionals required to report instances of suspected and known child abuse].)
With respect to permissive reporters, section 11172, subdivision (a) grants only qualified immunity. "Any other person reporting a known or suspected instance of child abuse or neglect shall not incur civil or criminal liability as a result of any report authorized by this article unless it can be proven that a false report was made and the person knew that the report was false or was made with reckless disregard of the truth or falsity of the report, and any person who makes a report of child abuse or neglect known to be false or with reckless disregard of the truth or falsity of the report is liable for any damages caused." (Italics added.)
*326 Smith, focusing on the words "any other person" as used in sections 11166, subdivision (e) and 11172, subdivision (a) contends the Legislature obviously meant to include six-year-old minors as permissive reporters. To resolve the issue, we look first to the words of the statute. "When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms." (DuBois v. Workers' Comp. Appeals Bd. (1993) 5 Cal.4th 382, 387-388, 20 Cal.Rptr.2d 523, 853 P.2d 978.)
The language of the earlier versions of the reporting statutes is plain. Mandated reporters were required to report (former § 11161.5), and permissive reporters (former § 11161.6.) were allowed to report, child abuse if the reporter "observed" suspected abuse. The word "observe" means "To perceive; notice. 2. To watch attentively: observe a child's behavior." (American Heritage Diet. (2d college ed.1982) p. 858.) Sexual abuse is inflicted upon a child. The abuse is experienced, not observed. We therefore conclude that the earlier versions of the mandated and permissive reporting provisions referred to third parties and not to children reporting their own alleged abuse.
Current versions of the reporting provisions include, in addition to individuals who "observe" suspected child abuse, individuals who have "knowledge of a child whom the reporter "knows or reasonably suspects has been a victim of child abuse or neglect." (§ 11166, subds. (a), (e).) The word "knowledge" is defined as: "1. The state or fact of knowing. 2. Familiarity, awareness, or understanding gained through experience or study. 3. The sum or range of what has been perceived, discovered, or learned. 4. Learning; erudition." (American Heritage Diet. (2d college ed.1982) p. 705.) It could be argued that a child "has knowledge of his or her own abuse when he or she experiences it, and thus qualifies as a permissive reporter.
We are mindful, however, that we do not construe statutes in isolation, but rather read every statute with reference to the entire scheme of law of which it is a part so that the whole may be harmonized and retain effectiveness. (People v. Pieters (1991) 52 Cal.3d 894, 899, 276 Cal.Rptr. 918, 802 P.2d 420.) Nothing contained within the Act suggests that any of its "reporting" provisions are applicable to minors alleging sexual abuse. The Act's definition of "child" (§ 11165), definitions relating to mandating reporting and training (§ 11165.7), provision concerning investigating a child abuse complaint by a parent or guardian against a school employee (§ 11165.14), duty to report provisions (§ 11166) and the "required information" provisions relating to reports (§ 11167) all suggest that "reporters of child abuse" subject to the Act are third party reporters. The Act describes three classes of individuals, mandated reporters, permissive reporters and the protected class, children. The language of the Act makes clear that it applies to the reporting of suspected child abuse and statements made in connection therewith, and not statements made by the protected class to their caregivers and to authorities investigating a subsequently filed complaint.
Our conclusion is bolstered by the legislative history of the Act which establishes that mandated reporters are third parties who, because of their professions, come into close contact with children, and thus are in an ideal position to report suspected child abuse. What section 11166, subdivision (e) evidences is the Legislature's concern that other individuals who come into contact with children be encouraged to report known or suspected child abuse. It seems clear that our Legislature was *327 aware that friends, relatives, and neighbors file the largest number of child abuse reports (Freiman, Unequal And Inadequate Protection Under The Law: State Child Abuse Statutes, supra, 50 Geo. Wash. L.Rev. at p. 259), and that in recognition of this fact section 11166, subdivision (e) was enacted as a catchall provision necessary to encourage these individuals, as well as other third parties, to report known or suspected instances of child abuse.
At least one legal commentator has reached the same conclusion. "Child abuse laws, as most laws concerning children in our society, stem from society's need to protect children, rather than from a concern about children's rights. If an adult is assaulted, he or she is more likely to be capable of reporting the incident to the authorities. Society's view of children, however, is that a child may be too young to protect himself or too frightened to report the abuse to the appropriate authorities." (Marrus, Please Keep My Secret: Child Abuse Reporting Statutes, Confidentiality, and Juvenile Delinquency, supra, 11 Geo. J. Legal Ethics at p. 514.)[14] "Because of this reasoning, it is unlikely ... that when legislators expanded the reporting statutes to include everyone as a discretionary or mandatory reporter that they meant to include the abused child in that category. As stated, the reporting statutes were first developed because of the belief that children need added protection. It is unrealistic to expect the abused child to self report the abuse. If all children were capable of doing this, there would be no need for reporting statutes. Children would call Child Protective Services on their own and the state would be able to intervene to protect the child." (Id. at p. 514, fn. 24.)
The language of section 11166, subdivision (e), together with the structure and legislative history of the statute, convince us that the phrase "[a]ny other person" used in sections 11166, subdivision (e) and 11172, subdivision (a) means third persons who acquire knowledge, or observe injuries or other signs indicating that a child has been abused. Our conclusion is consistent with the purpose of the Act which is to "combat child neglect and the physical, emotional and sexual victimization of children." (Planned Parenthood Affiliates v. Van de Kamp (1986) 181 Cal. App.3d 245, 255, 226 Cal.Rptr. 361, 58 Ops.Cal.Atty.Gen. 824, 828 (1975) [opining "entire legislative scheme in the area of child protection is aimed at discovering more cases and preventing serious harm by taking remedial action."].)

D. Roe and Begier are inapplicable.
The trial court, citing Roe, held that the statements made by M.D.'s grandmother and M.D.'s parents to the police could be imputed to M.D. for purposes of the Act. Roe is, of course, inapplicable since we have held that the Act does not apply to minors such as M.D. who report their own alleged child abuse. Moreover, Roe is distinguishable.
In Roe, a husband sued his former wife for defamation, claiming that the wife, a permissive reporter under the Act, knowingly made a false report of child sexual abuse to a psychotherapist, a mandated reporter under the Act, with the purpose of causing the psychotherapist to file a *328 false suspected child abuse report. {Roe, supra, 229 Cal.App.3d at pp. 835, 841-843, 280 Cal.Rptr. 380.) The Roe court held, properly we believe, that if it could be proved that the wife engaged the services of the psychotherapist for the purpose of causing a false child abuse report to be filed with the police, equity would require the report be imputed to the wife, for the purposes of the Act. (Id. at p. 843, 280 Cal.Rptr. 380.)
The Roe holding makes sense because psychotherapists are mandated reporters under the Act and are required, under threat of criminal prosecution, to report allegations of child abuse to the authorities. (§ 11166, subd. (b).)[15] Here, however, a permissive reporter (if we accept Smith's interpretation of the Act) told her caregivers, also permissive reporters under the Act, that she had been sexually abused. Unlike the wife in Roe, M.D. could not be assured her caregivers would forward her allegations to the authorities because her caregivers were permissive reporters, and, as such, could not be held criminally or civilly liable for failing to do so.
Begier, too, is inapplicable. In that case, the plaintiff filed an action against his former wife for malicious prosecution and intentional infliction of emotional distress based upon her alleged conduct in filing a false police report accusing plaintiff of molesting the couple's daughter and repeating that charge in the couple's dissolution action. (Begier, supra, 46 Cal.App.4th at p. 880, 54 Cal.Rptr.2d 158.) The trial court sustained the wife's demurrer as to the intentional infliction of emotional distress cause of action, but overruled the demurrer as to the malicious prosecution count. (Ibid.) The Court of Appeal affirmed the judgment as to the cause of action for malicious prosecution, but reversed as to the cause of action for intentional infliction of emotional distress. (Id. at p. 888, 54 Cal.Rptr.2d 158.) The Begier court held that the alleged false accusations within the dissolution action were privileged under Civil Code section 47(b). (Begier, supra, 46 Cal.App.4th at p. 882, 54 Cal.Rptr.2d 158.) The court also held, however, that even if the filing of a false child abuse police report is subject to the litigation privilege found in Civil Code section 47(b), the Legislature's direction in section 11172 that a person who knowingly makes a false report of child abuse "is liable for any damages caused" creates a limited exception to the privilege. (Begier, supra, 46 Cal.App.4th at pp. 883-885, 54 Cal.Rptr.2d 158.)
In reaching its decision, the Begier court discerned within the Act "a legislative effort to balance, on the one hand, the public interest in ferreting out cases of child abuse so that the child victims can be protected from harm and, on the other hand, the policy of protecting the reputations of those who might be falsely accused. [Citation.] The Legislature has struck that balance by withholding immunity from those who knowingly make false reports of child abuse. If we were to hold that same conduct privileged under Civil Code section 47, we would essentially nullify the Legislature's determination that liability should attach." (Begier, supra, 46 Cal.App.4th at p. 885, 54 Cal.Rptr.2d 158, fn. omitted.)
*329 The crucial distinction between Begier and the instant case is that unlike the former wife in Begier, M.D. is not a permissive reporter under the Act. Accordingly, she is entitled to assert privileges found outside the Act, including the privilege embodied within Civil Code section 47(b).

E. M.D. is entitled to assert the absolute litigation privilege set forth in Civil Code section 47(b).
M.D. contends her statements to her grandmother, her parents and the police are subject to the absolute litigation privilege found in Civil Code section 47(b).
Civil Code section 47(b) provides an absolute immunity for any communication made "[i]n any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law...."
The privilege "promotes the effectiveness of judicial proceedings by encouraging `open channels of communication and the presentation of evidence' in judicial proceedings. [Citation.] A further purpose of the privilege `is to assure utmost freedom of communication between citizens and public authorities whose responsibility is to investigate and remedy wrongdoing.' [Citations.]" (Silberg v. Anderson (1990) 50 Cal.3d 205, 213, 266 Cal.Rptr. 638, 786 P.2d 365.) The privilege "is given a broad application in furtherance of the public policy it is designed to serve." (Devis v. Bank of America (1998) 65 Cal.App.4th 1002, 1010, 77 Cal. Rptr.2d 238.)

1. M.D.'s statements to the police.
M.D. contends her statements to the police are privileged as statements made in any "other official proceeding authorized by law." We agree.
California appellate courts are split on the issue of whether the absolute privilege of Civil Code section 47(b) shields testimony or statements to officials conducting criminal investigations. (Beroiz v. Wahl (2000) 84 Cal.App.4th 485, 495, 100 Cal. Rptr.2d 905.) The majority of California courts follow Williams v. Taylor (1982) 129 Cal.App.3d 745, 181 Cal.Rptr. 423 (Williams), which concluded that the absolute privilege shielded the report to the police by a president of a car dealership of what he believed to be criminal activity conducted by a discharged employee. (See, e.g., Beroiz v. Wahl, supra, 84 Cal. App.4th at pp. 495, 489-490, 100 Cal. Rptr.2d 905 [statements by residents of a condominium complex initiating a criminal investigation against plaintiffs in Mexico absolutely privileged]; Cabesuela v. Browning-Ferris Industries of California, Inc. (1998) 68 Cal.App.4th 101, 112, 80 Cal.Rptr.2d 60 [company's communication to police accusing terminated employee of threat of violence protected by absolute privilege of Civil Code section 47(b) even if the report was made in bad faith]; Dove Audio, Inc. v. Rosenfeld, Meyer & Susman (1996) 47 Cal.App.4th 777, 781-783, 54 Cal.Rptr.2d 830 [law firm's letters to third persons in connection with the firm's investigation preparatory to filing a complaint with the Attorney General held rationally connected to anticipated litigation]; Passman v. Torkan (1995) 34 Cal.App.4th 607, 616-620, 40 Cal.Rptr.2d 291 [letter by party to district attorney's office recommending investigation and prosecution of opposing party subject to absolute privilege of Civil Code section 47(b) ]; Hunsucker v. Sunnyvale Hilton Inn (1994) 23 Cal.App.4th 1498, 1502-1505, 28 Cal. Rptr.2d 722 [absolute privilege of Civil Code section 47(b) applied where hotel management called police upon being informed by a maid that a customer was seen brandishing a gun]; Cote v. *330 Henderson (1990) 218 Cal.App.3d 796, 806, 267 Cal.Rptr. 274 [report of rape to police was absolutely privileged under Civil Code section 47(b) ]; Kim v. Walker (1989) 208 Cal.App.3d 375, 383, 256 Cal.Rptr. 223 [attorney's communications to plaintiffs parole agent were absolutely privileged]; Johnson v. Symantec Corp. (N.D.Cal.1999) 58 F.Supp.2d 1107, 1113 [police reports were absolutely privileged under Civil Code section 47(b)(3)]; Forro Precision, Inc. v. Intern. Business Machines (9th Cir.1982) 673 F.2d 1045, 1056 [communications by IBM officials to police were absolutely privileged].)
The other side of the split is represented by Fenelon v. Superior Court (1990) 223 Cal.App.3d 1476, 273 Cal.Rptr. 367 (Fenelon) which holds that a knowingly false police report is not absolutely privileged, as the police department is not a quasijudicial body. (Id. at pp. 1478, 1483, 273 Cal.Rptr. 367). According to the Fenelon court, false police reports are entitled to only the qualified privilege for communications to interested parties. (Id. at p. 1483.) Fenelon, however, has been criticized by cases following Williams on the basis that "the constitutional and procedural safeguards governing California's judicial system undermine the concern that applying the absolute privilege to police reports endangers the rights of the reported wrongdoer." (Beroiz v. Wahl, supra, 84 Cal.App.4th at pp. 495-496, 100 Cal. Rptr.2d 905.) While the Williams court recognized the importance of communication between citizens and the police, and that effective investigation requires an open channel of communication that would not be possible if a qualified rather than an absolute privilege applied (Williams, supra, 129 Cal.App.3d at pp. 753-754, 181 Cal.Rptr. 423), the Fenelon court feared abuse of the absolute privilege.
We agree with the Williams court, and conclude that police investigations are official proceedings within the meaning of the absolute official proceeding privilege of Civil Code section 47(b). Thus, we conclude that M.D.'s statements to the police that Smith sexually abused her are absolutely privileged.

2. M.D.'s statements to her parents and her grandmother.
We next consider whether the absolute litigation privilege applies to protect the allegedly defamatory statements made by M.D. to her parents and grandmother.
To be protected under the privilege statements must be made: (1) in, or in anticipation of litigation; (2) by participants in the litigation; (3) in order to achieve the objects of the litigation; and (4) they must have some "connection or logical relation to the action." (Rothrnan v. Jackson, supra, 49 Cal.App.4th at p. 1145, 57 Cal.Rptr.2d 284.)
It is clear that M.D.'s statements to her caregivers that Smith had sexually abused her were logically related to the criminal proceeding that followed, and that the statements were made in order to achieve the objects of the litigation. Smith claims, however, that the privilege is inapplicable under the facts of this case because the record is devoid of any evidence showing that the statements were made in anticipation of litigation, and because M.D.'s caregivers were nonparticipants in the criminal action. We disagree.
Smith claims that the privilege applies "only if, when the statement is made, litigation is actually and in good faith suggested or proposed. Thus, M.D.'s statement[s] to her [caregivers are] absolutely protected only if, when she made the statements], either she or her [caregivers] had suggested in good faith referring the matter *331 to law enforcement." While most adults would know that protection and/or relief for wrongs perpetrated upon them is available from governmental authorities such as the police, we cannot conclude that a child of tender years would have the same sophisticated knowledge. It is the parents who would know to seek relief from the police and/or courts for the protection of the child. The fact that M.D.'s parents contacted the police following M.D.'s statements shows that they contemplated initiating a criminal investigation. This, we believe, is sufficient.
We also believe that under the facts presented M.D.'s caregivers must be considered participants in the criminal litigation. M.D.'s communications were made to her parents and grandmother, individuals who are charged with not only her care, but also her protection. We have no difficulty in concluding that children of tender years, such as M.D., simply do not think to pick up the telephone and report alleged sex abuse by a neighbor to the police. Under ordinary circumstances their first instinct would be to seek the counsel of an adult such as a parent, grandparent or trusted friend. (Ayala & Martyn, "To Tell or Not to Tell? An Analysis of Testimonial Privileges: The Parent-Child and Reporter's Privileges (1993) 9 St. John's J. Legal Comment 163, 179["[W]hen children are faced with a serious problem and are unsure about how to handle themselves, their first reaction is usually to seek assistance and advice from their parents. Because children are inclined to confide in their parents, there exists a need for the free flow of highly personal information"].) If such an individual reports the incident to the police on behalf of the child, that person necessarily becomes involved in any criminal litigation flowing from the child's report of abuse. We conclude that under the facts of this case, where the alleged victim is of tender years, and has communicated an alleged crime to trusted adults, those adults must be considered "participants" in any criminal and/or civil litigation that follows.[16]
We find support for our conclusion in the guardian ad litem statute which provides that children under the age of 12 may not seek any relief from the courts in the absence of the appointment of a guardian ad litem to protect the minor's interest (Code Civ. Proa, § 372, subd. (a)) and in De Los Santos v. Superior Court (1980) 27 Cal.3d 677, 166 Cal.Rptr. 172, 613 P.2d 233 which holds that knowledge obtained by a minor's parent, as guardian ad litem, to secure information to communicate to an attorney, is protected by the attorneyclient privilege, as though the minor had communicated directly to the attorney. (Id. at pp. 683-684, 166 Cal.Rptr. 172, 613 P.2d 233.)
Allowing minors such as M.D. to assert the absolute privilege found in Civil Code section 47(b) promotes the principal purpose of the statute, which "is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.]" (Silberg v. Anderson, supra, 50 Cal.3d at p. 213, 266 Cal.Rptr. 638, 786 P.2d 365.) It also promotes California's interest in identifying child abuse victims. (Storch v. Silverman, supra, 186 Cal.App.3d at p. 676, *332 231 Cal.Rptr. 27 ["The state has a strong interest in the prevention of child abuse. Since the child abuser often repeats the abuse, identification of a victim offers an opportunity for intervention by authorities. However, identification is often difficult due to the natural characteristics of the child and the private or special circumstances in which the abuse may occur"], fn. omitted.)

F. A malicious prosecution action is not viable.
The fact that a communication may be absolutely privileged under Civil Code section 47(b) for the purposes of a defamation action does not prevent its being an element of an action for malicious prosecution in a proper case. (Fremont Comp. Ins. Co. v. Superior Court (1996) 44 Cal.App.4th 867, 877, 52 Cal.Rptr.2d 211.) "The policy of encouraging free access to the courts that underlies the absolute privilege applicable in defamation actions is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied. [Citations.]" (Albertson v. Raboff (1956) 46 Cal.2d 375, 382, 295 P.2d 405.)
"`A termination is favorable when it reflects "the opinion of someone, either the trial court or the prosecuting party, that the action lacked merit or if pursued would result in a decision in favor of the defendant."` [Citation.] `It is not enough ... merely to show that the proceeding was dismissed.' [Citation.] The termination must demonstrate the innocence of the accused." (Cantu v. Resolution Trust Corp. (1992) 4 Cal.App.4th 857, 881, 6 Cal. Rptr.2d 151.)
Here, the criminal action was dismissed in the interest of justice pursuant to section 1385. Such a dismissal is generally not deemed a favorable termination of the proceedings because it leaves open the question of the defendant's guilt or innocence. (De La Riva v. Owl Drug Co. (1967) 253 Cal.App.2d 593, 599-600, 61 Cal. Rptr. 291 [holding a dismissal pursuant to section 1385 reflects ambiguously on the merits of the action as it "implies considerations which would favor each side to [the] litigation"]; accord Minasian v. Sapse (1978) 80 Cal.App.3d 823, 827, fn. 4, 145 Cal.Rptr. 829.) Under the circumstance, it would appear that Smith does not have a claim for malicious prosecution.

G. Public policy does not preclude suits for defamation against minors.
M.D., citing public policy considerations, contends that children seven years of age and younger should be immune from defamation lawsuits based on the reporting of child abuse. We find no support for such a contention in the law.
The tort of defamation arises from intentional harm to an individual's reputation, and has two forms, libel[17] and slander.[18] (Lundquist v. Reusser (1994) 7 *333 Cal.4th 1193, 1203, 31 Cal.Rptr.2d 776, 875 P.2d 1279.) Civil liability for defamation exists as the result of an "intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage. [Citations.] Publication, which may be written or oral, is defined as a communication to some third person who understands both the defamatory meaning of the statement and its application to the person to whom reference is made." (Ringler Associates Inc. v. Maryland Casualty Co. (2000) 80 Cal.App.4th 1165, 1179, 96 Cal. Rptr.2d 136.)
The general proposition that an infant is liable for his torts is established in California by Family Law section 6600 which provides that "[a] minor is civilly liable for a wrong done by the minor, but is not liable in exemplary damages unless at the time of the act the minor was capable of knowing that the act was wrongful." Section 6600 "indicates clearly that the Legislature intended that a minor ... should be liable in compensatory damages for his tortuous conduct even though he was not capable of knowing the wrongful character of his act at the time he committed it." (Mullen v. Bruce (1959) 168 Cal. App.2d 494, 497, 335 P.2d 945 [discussing former Civil Code section 41[19]].)
Other authorities have upheld the general rule that a child of tender years may be held liable for his or her torts. (Weisbart v. Flohr (1968) 260 Cal.App.2d 281, 67 Cal.Rptr. 114 [holding a seven-year-old boy who willfully threatened a five-yearold girl with harm through shooting of an arrow at or toward her, and who thereafter made good the threat and, consequently, inflicted an assault and battery on the girl, responsible for damage caused by him irrespective of whether or not he was guilty of technical negligence]; Singer v. Marx (1956) 144 Cal.App.2d 637, 301 P.2d 440 [holding a nine-year-old boy responsible for striking a neighborhood girl with a rock thrown by him in the direction of two neighbor girls living on the same street]; Ellis v. DAngelo (1953) 116 Cal.App.2d 310, 253 P.2d 675 [holding a four-year-old defendant could be sued for damage caused by a battery when he pushed the plaintiff violently to the floor].)
Smith, pointing to Civil Code section 48.7,[20] which prohibits a person *334 charged with child abuse from bringing a defamation action against a minor and others while criminal charges are pending, contends that our Legislature must have contemplated meritorious actions for defamation against minors reporting child sexual abuse. We disagree. Section 48.7 was enacted "to prevent a person accused of crimes against children from intimidating victims, witnesses and parents by filing or threatening to file a civil slander or libel action" while the criminal action was pending. (Sen. Republican Caucus, 3d reading analysis of Assem. Bill No. 42, (1981-1982 Reg. Sess.) as amended June 17, 1981, p. 2.) The proponents of the legislation argued that the legislation was necessary because "the tactic of bringing a defamation action may produce a chilling effect on the willingness of persons to participate in the prosecution of actual crimes against the minors." (Ibid.) We view the enactment of Civil Code section 48.7 as an acknowledgement of the litigious nature of our society, and recognition of the possibility that defamation actions could be filed against minors, including those of tender years, as tactical maneuvers.
While we are satisfied that the statements here were privileged under Civil Code section 47(b), we believe that the question of immunity from such lawsuits is a matter best left to the Legislature.

H. M.D.'s appeal from the denial of her anti-SLAPP motion is moot.
M.D. filed, concurrently with her demurrer, a special motion to strike Smith's defamation complaint under Code of Civil Procedure section 425.16 (the anti-SLAPP statute). She argued that her statements to her caregivers and the police were absolutely privileged under Civil Code section 47(b). When the motion was denied, M.D., through her guardian ad litem, filed a timely notice of appeal.
The anti-SLAPP statute permits a defendant to file a special motion to strike in response to a meritless suit filed primarily to chill the defendant's exercise of First Amendment rights. (Gallimore v. State Farm Fire & Casualty Ins. Co. (2002) 102 Cal.App.4th 1388, 1395, 126 Cal. Rptr.2d 560.) The statute provides in pertinent part that, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech ... in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (Code Civ. Proc, § 425.16, subd. (b)(1).) Although we believe the statute, which is to be construed broadly (Code Civ. Proc, § 425.16, subd. (a)), applies to Smith's defamation complaint, we need not decide the issue since we have determined, in connection with the writ petition,
that the statements made by M.D. to her caregivers and the police are absolutely privileged pursuant to Civil Code section 47(b), and that M.D.'s demurrer should, therefore, have been sustained without leave to amend. We thus conclude that M.D.'s appeal from the order denying her Code of Civil Procedure section 425.16 motion is moot.

IV. CONCLUSION
By this reversal we preclude Smith from any relief or compensation for the grievous injury which we must assume, based upon our required acceptance of the truth of his pleadings, resulted from intentionally false *335 and malicious acts on the part of M.D. "We do so because we are obligated to honor the determination of the Legislature that protection of one innocent segment of society warrants occasional injury to another." (Thomas v. Chadwick, supra, 224 Cal. App.3d at p. 827, 274 Cal.Rptr. 128.)

V. DISPOSITION
Let a writ of mandate issue directing the superior court to set aside its order overruling petitioner's demurrer to real party's complaint for defamation, and issue a new and different order sustaining without leave to amend petitioner's demurrer to the complaint. Petitioner's appeal (B159868) is dismissed. The temporary stay is vacated. Petitioner is awarded the costs of this petition. Appellant to recover the costs of the appeal.
We concur: NOTT, and DOI TODD, JJ.
NOTES
[1] All further statutory references will be to the Penal Code unless otherwise specified.
[2] To the complaint Smith attached police reports and other documents describing relevant events.
[3] Section 1385, subdivision (a) provides that "[t]he judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons for the dismissal must be set forth in an order entered upon the minutes. No dismissal shall be made for any cause which would be ground of demurrer to the accusatory pleading."
[4] The complaint set forth three causes of action for slander, based on three different publications.
[5] Section 11166, subdivision (e) provides: "Any other person who has knowledge of or observes a child whom he or she knows or reasonably suspects has been a victim of child abuse or neglect may report the known or suspected instance of child abuse or neglect to an agency specified in Section 11165.9."
[6] Section 11172 provides as follows: "No mandated reporter shall be civilly or criminally liable for any report required or authorized by this article. Any other person reporting a known or suspected instance of child abuse or neglect shall not incur civil or criminal liability as a result of any report authorized by this article unless it can be proven that a false report was made and the person knew that the report was false or was made with reckless disregard of the truth or falsity of the report, and any person who makes a report of child abuse or neglect known to be false or with reckless disregard of the truth or falsity of the report is liable for any damages caused. No person required to make a report pursuant to this article, nor any person taking photographs at his or her direction, shall incur any civil or criminal liability for taking photographs of a suspected victim of child abuse or neglect, or causing photographs to be taken of a suspected victim of child abuse or neglect, without parental consent, or for disseminating the photographs with the reports required by this article. However, this section shall not be construed to grant immunity from this liability with respect to any other use of the photographs.

"(b) Any person, who, pursuant to a request from a government agency investigating a report of suspected child abuse or neglect, provides the requesting agency with access to the victim of a known or suspected instance of child abuse or neglect shall not incur civil or criminal liability as a result of providing that access.
"(c) The Legislature finds that even though it has provided immunity from liability to persons required or authorized to make reports pursuant to this article, that immunity does not eliminate the possibility that actions may be brought against those persons based upon required or authorized reports. In order to further limit the financial hardship that those persons may incur as a result of fulfilling their legal responsibilities, it is necessary that they not be unfairly burdened by legal fees incurred in defending those actions. Therefore, a mandated reporter may present a claim to the State Board of Control for reasonable attorney's fees and costs incurred in any action against that person on the basis of making a report required or authorized by this article if the court has dismissed the action upon a demurrer or motion for summary judgment made by that person, or if he or she prevails in the action. The State Board of Control shall allow that claim if the requirements of this subdivision are met, and the claim shall be paid from an appropriation to be made for that purpose. Attorney's fees awarded pursuant to this section shall not exceed an hourly rate greater than the rate charged by the Attorney General of the State of California at the time the award is made and shall not exceed an aggregate amount of fifty thousand dollars ($50,000).
"This subdivision shall not apply if a public entity has provided for the defense of the action pursuant to Section 995 of the Government Code.
"(d) A court may award attorney's fees and costs to a commercial film and photographic print processor when a suit is brought against the processor because of a disclosure mandated by this article and the court finds this suit to be frivolous."
[7] "Child abuse and neglect are not modern occurrences. Greek and Roman records suggest the predominance of child abuse during those times. `Because their fathers could sell, abandon, or maltreat them, Roman children occupied the status of chattels.' Witness accounts throughout history provide vivid stories of how children have been ruthlessly tortured, whipped, burned, disfigured, and even killed." (Richardson, Physician/Hospital Liability for Negligently Reporting Child Abuse (2002) 23 J. Legal Med. 131, 132, fns. omitted.) "Even as late as the mid-1800s, infanticide was accepted as a means to control population size and to rid the population of people with birth defects. Children were sold into slavery or used for cheap labor. Abusive practices were common in society at large and parents were influenced by these practices." (Mantis, Please Keep My Secret: Child Abuse Reporting Statutes, Confidentiality, and Juvenile Delinquency (1998) 11 Geo. J. Legal Ethics 509, 513, fns. omitted.) The first reported criminal cases involving child abuse in the United States date back to the late 1600's. However, it was not until 1874 that the first documented civil child protection case appeared. It was this case that prompted concerned citizens to organize the New York Society for the Prevention of Cruelty to Children. (Trost, Chilling Child Abuse Reporting: Rethinking The CARTA Amendments (1998) 51 Vand. L.Rev. 183, 189.) By 1905, 400 additional organizations had been formed to prevent cruelty to children or to intervene upon discovery of cruelty. (Freiman, Unequal and Inadequate Protection Under The Law: State Child Abuse Statutes (1982) 50 Geo. Wash. L.Rev. 243, 244.) These organizations were instrumental in calling attention to the maltreatment of children, in bringing criminal complaints against perpetrators, and in placing thousands of neglected children in institutional care. (Trost, Chilling Child Abuse Reporting: Rethinking the CAPTA Amendments, supra, 51 Vand. L.Rev. at p. 189.)
[8] Former section 11161.5 read as follows: "In any case, in which a minor is brought to a physician and surgeon for diagnosis or treatment, or is under his charge or care, and it appears to the physician and surgeon from observation of the minor that the minor may have been a victim of a violation of Section 273a, he shall report such fact by telephone and in writing to the head of the police department of the city or city and county, if the observation is made in a city or city and country, or to the sheriff, if the observation is made in unincorporated territory, or to the nearest child welfare agency offering child protective services. The report shall state, if known, the name of the minor, his whereabouts and the character and extent of the injuries. [A] The physician and surgeon shall not be required to report as provided herein if in his opinion it would not be consistent with the health, care, or treatment of the minor." (Former § 11161.5.)
[9] By 1967 every state had some type of reporting statute in place. (Singley, Failure to Report Suspected Child Abuse: Civil Liability of Mandated Reporters, supra, 19 J. Juv. L. at p. 238.)
[10] In 1980, section 11166, subdivision (a) read as follows: "Except as provided in subdivision (b), any child care custodian, medical practitioner, nonmedical practitioner, or employee of a child protective agency who has knowledge of or observes a child in his or her professional capacity or within the scope of his or her employment whom he or she reasonably suspects has been the victim of child abuse shall report such suspected instance of child abuse to a child protective agency immediately or as soon as practically possible by telephone and shall prepare and send a written report thereof within 36 hours of receiving the information concerning the incident. For the purposes of this article, `reasonable suspicion' means that it is objectively reasonable for a person to entertain such a suspicion, based upon facts that could cause a reasonable person in a like position, drawing when appropriate on his or her training and experience, to suspect child abuse." Subdivision (c) provided that "[a]ny person who had knowledge of or observes a child whom he or she reasonably suspects has been a victim of child abuse may report such suspected instance of child abuse to a child protective agency."
[11] The Legislature made clear that in repealing former sections 11161.5, 11161.6, and in enacting the 1980 Child Abuse Reporting Law it did not intend "to alter the holding in the decision of [Landeros], which imposes civil liability for a failure to report child abuse." (See Historical and Statutory Notes, 51C West's Ann. Pen.Code (2000 ed.) foil. § 11165, p. 566.)
[12] Former section 11172, subdivision (a) provided, in relevant part: "No child care custodian, medical practitioner, nonmedical practitioner, employee of a child protective agency, or commercial film and photographic print processor who reports a known or suspected instance of child abuse shall be civilly or criminally liable for any report required or authorized by this article. Any other person reporting a known or suspected instance of child abuse shall not incur civil or criminal liability as a result of any report authorized by this article unless it can be proven that a false report was made and the person knew that the report was false."
[13] The agencies referred to in section 11165.9 include "any police department or sheriff's department, not including a school district police or security department, county probation department, if designated by the county to receive mandated reports, or the county welfare department." (§ 11165.9.)
[14] The author notes that Michigan is the only state to include children as reporters, and opines that children were included "to encourage a child who observed another child being abused to feel comfortable reporting the abuse to the appropriate authorities." (Marrus, Please Keep My Secret: Child Abuse Reporting Statutes, Confidentiality, and Juvenile Delinquency, supra, 11 Geo. J. Legal Ethics at p. 514, fn. 24.)
[15] Section 11166, subdivision (b) provides that "[a]ny mandated reporter who fails to report an incident of known or reasonably suspected child abuse or neglect as required by this section is guilty of a misdemeanor punishable by up to six months confinement in a county jail or by a fine of one thousand dollars ($1,000) or by both that fine and punishment."
[16] Parents and other adults who report child abuse and neglect based on information from minors are permissive reporters under the Act. As such they are entitled to qualified, rather than absolute, immunity. (§ 11172, subd. (a).) Nothing contained in this opinion should be construed to mean that parents and other caregivers who report child abuse to the police are entitled, as a result of being a minor's conduit to the police, to absolute immunity.
[17] Libel is statutorily defined as follows: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which cause him [or her] to be shunned or avoided, or which has a tendency to injure him in his [or her] occupation." (Civ.Code, § 45.)
[18] Slander is statutorily defined as follows: "Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: [¶] 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime; [¶] 2. Imputes [to] him [or her] the present existence of an infectious, contagious, or loathsome disease; [¶] 3. Tends directly to injure him [or her] in respect to his [or her] office, profession, trade or business, either by imputing to him [or her] general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his [or her] office, profession, trade, or business that has a natural tendency to lessen its profits; [¶] 4. Imputes to him [or her] impotence or a want of chastity; or [11] 5. Which, by natural consequence, causes actual damage." (Civ.Code, § 46.)
[19] Former Civil Code section 41, enacted in 1872, provided: "A minor, or a person of unsound mind, of whatever degree, is civilly liable for a wrong done by him, but is not liable in exemplary damages unless at the time of the act he was capable of knowing that it was wrongful." Family Law section 6600 "continues without substantive change the part of former Civil Code section 41 that related to minors. The part of the former section that related to persons of unsound mind is continued in new Civil Code Section 41." (Cal. Law Revision Com. com., 29E West's Ann. Fam.Code (1994 ed.) foil. § 6600, p. 58.)
[20] Civil Code section 48.7, subdivision (a) provides: "No person charged by indictment, information, or other accusatory pleading of child abuse may bring a civil libel or slander action against the minor, the parent or guardian of the minor, or any witness, based upon any statements made by the minor, parent or guardian, or witness which are reasonably believed to be in furtherance of the prosecution of the criminal charges while the charges are pending before a trial court. The charges are not pending within the meaning of this section after dismissal, after pronouncement of judgment, or during an appeal from a judgment. [¶] Any applicable statute of limitations shall be tolled during the period that such charges are pending before a trial court."